

1

2    **Entered on Docket**
     **July 19, 2011**                    *Bruce A. Markell*
3                                  _____
                                       **Hon. Bruce A. Markell**
                                    **United States Bankruptcy Judge**

4

5                    UNITED STATES BANKRUPTCY COURT

6                          DISTRICT OF NEVADA

7                              * * * * * *

8    In re:                          )    Case No.: BK-S-10-33338-BAM
9                                    )
     MARIAN MILDRED STANTON,         )    Chapter 11
10                                   )
            Debtor.                  )
11                                   )    Date:        June 22 & 27, 2011
                                     )    Time:        9:30 a.m. & 3:00 p.m.
12   _____)    Courtroom:   3

13                          **REVISED OPINION**

14   BRUCE A. MARKELL, Bankruptcy Judge

15                   **I. Introduction and Facts**

16        All siblings fight.  Rich siblings fight interminably.

17        This case involves the continuing efforts of Carolyn Weidman to drive her sister Marian

18   Mildred Stanton into penury.  Stanton is 71 years old and a debtor in this court.

19        It's not that Weidman doesn't have cause to be vexed and irritated at her sister.  Weidman

20   holds a Colorado state court judgment of over $525,000 against her sister for, among other things,

21   fraud and breach of fiduciary duty involving their now-deceased mother.[1]  She also holds another

22   judgment for approximately $518,000 representing attorneys' fees and costs incurred in obtaining

23   the first judgment.  These judgments were hard won; the Colorado trial court, after noting that

24   Stanton was "argumentative and evasive throughout the entire trial," stated that Stanton "lives in a

25   _____

26        [1]Weidman holds this judgment in her capacity as the Trustee of the Barbara J. Mikovec Trust.
     For purposes of convenience, this opinion simply refers to her as "Weidman."

1 different reality and has little capacity to perceive the actual reality."[2]

2   Weidman obtained her judgment against her sister in 2008.  It appears that Stanton had over

3 $500,000 in assets at that time.  Since then, Weidman has been actively enforcing her judgment and

4 seeking to reduce her sister's wealth.  She has levied upon Stanton's bank accounts, upon her stocks

5 and other financial assets, and upon Stanton's rental real estate.

6   Stanton filed bankruptcy in December 2010, seeking to save some of her remaining wealth.

7 Weidman has sought to deny her that goal.  This contested matter is one of several actions Weidman

8 has initiated against Stanton in this court.[3]  In this particular contested matter, Weidman objects to

9 Stanton's claimed homestead exemption.

10   Stanton bought the house she claims as exempt in 2002.  She paid $252,000 for it, borrowing

11 approximately $175,000, and paying the rest in cash.  By 2008, when the events relevant to this

12 motion occurred, Stanton had, through a pattern of irregular lump sum payments, paid down the

13 principal amount of the loan to approximately $89,000.

14   Stanton indirectly paid the loan off in 2008 soon after the entry of the Colorado judgment.

15 She obtained the funds necessary for the payment by selling some nonexempt investments and then

16 giving some of the proceeds to her son with the understanding that he would pay off the loan.  As a

17 result, Stanton has owned her Nevada house free and clear since 2008.

18   Stanton filed a homestead declaration for the house in 2003.  That might have settled her

19 entitlement to a Nevada homestead interest but for the fact that, in 2004, she obtained a Colorado

20 driver's license and registered to vote in Colorado.  Both of these acts required her to renounce her

21

22   [2]The trial court's judgment was appealed, affirmed by the Colorado Court of Appeals, and the

23 Colorado Supreme Court denied certiorari.  It is final.  And while this court is not bound by the Colorado court's credibility determinations, this court's perception of Stanton's grasp of reality is not

24 dissimilar to what the Colorado trial court previously found.

25   [3]Weidman has also sought to have her Colorado state court judgments declared

26 nondischargeable.

1   Nevada domicile, and affirm, under penalty of perjury, that Colorado was then her home.  She

2   reversed these decisions in January 2008, when she changed her voter registration back to Nevada.

3   She obtained a Nevada driver's license in 2009.  Throughout this time period, however, her federal

4   tax returns listed her Nevada address, and she continued to receive utility and other bills at her

5   Nevada residence.

6          When her sister's state court enforcement actions became too pointed, Stanton filed for

7   chapter 7 bankruptcy relief.  She listed the Nevada house as her residence, stated its value was

8   $244,000, and sought to exempt this entire amount under Nevada's homestead exemption.

9          Weidman objected.  After the court held an initial status conference, but before an

10  evidentiary hearing could be held, Stanton filed a new declaration of homestead on March 31, 2011,

11  which, in form if not in substance, complied with Nevada law.

12                                      **II.  Legal Analysis**

13         Weidman has raised three objections: (i) that Stanton had not resided in Nevada for the 730

14  days preceding her filing and, thus, could not take advantage of Nevada's exemptions; (ii) that

15  Stanton's 2004 actions broke the continuity of her Nevada residence, and, thus if Nevada

16  exemptions apply, she needed to file a new homestead declaration before she filed bankruptcy,

17  which she did not do, in order to validly claim a Nevada homestead; and (iii) that even if she has a

18  valid Nevada homestead, Section 522(o) of the Bankruptcy Code requires reduction of that

19  homestead exemption by the amount of her son's 2008 payoff.[4]

20         As explained in this opinion, the court finds that Stanton is entitled to claim a homestead in

21  her residence under Nevada law, but that the value of her interest in that homestead must be reduced

22  by the amount of the 2008 payoff of the note secured by the residence.

23  _____

24         [4]Weidman also alleged that federal law preempted and negated Stanton's Nevada homestead
    exemption, as her Colorado judgment was for "fraud, deceit, or manipulation in a fiduciary capacity"
25  as contemplated in Section 522(q)(1)(B)(ii).  The parties agreed to carve out this issue and litigate it
    as part of Weidman's nondischargeability adversary proceeding.

26
                                              3

1    A.    *Insufficient Residency Under 11 U.S.C. § 522(b)(3)*

2    Section 522(b)(3) states that the state in which the debtor's domicile has been located for the

3  730 days immediately preceding the date of the filing of the petition provides the applicable slate of

4  exemptions.  The key concept is "domicile."  As stated in *Collier*:

5    The residence of a debtor may be nothing more than a place of sojourn. While
     ordinarily used in a sense of fixed and permanent abode, as distinguished from a
6    place of temporary occupation, the term "residence" does not include the intention
     required for domicile. *Domicile means actual residence coupled with a present*
7    *intention to remain there*.

8  4 COLLIER ON BANKRUPTCY ¶ 522.06 (Henry Sommer & Alan Resnick, eds., 16th ed. 2011)

9  (emphasis supplied); *see also Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673, 684 (9th

10 Cir. 1999), *cert. denied*, 528 U.S. 877 (1999) (debtor satisfied both physical presence and intent

11 requirements for establishing domicile); *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S.

12 30, 48 (1989) ("For adults, domicile is established by physical presence in a place in connection

13 with a certain state of mind concerning one's intent to remain there.").

14    Here, Weidman contends that Stanton did not make Nevada her domicile until she applied

15 for a Nevada driver's license on December 28, 2009.  As she filed on December 15, 2010, the 730-

16 day period began on December 15, 2008.  Since, by Weidman's reckoning, Stanton only began her

17 domicile in Nevada on December 28, 2009, Stanton has not been domiciled in Nevada for the

18 required 730 days.

19    This argument is not supported by either the hearing testimony or by Weidman's prior

20 statements.  Stanton testified that while she spent extended time in Colorado (the location of her

21 rental property, her sister's litigation against her, and the residence of her now-deceased mother),

22 she never really intended to relocate there permanently.  She explains her 2004 voter and driver's

23 registration as part of an effort to vote in Colorado rather than in Nevada in the 2004 presidential

24

25

26
                                        4

election.[5]  Against this background, Stanton's obtaining a Colorado driver's license and registering to vote in Colorado were simply part of a political effort to make her presidential vote count more by relocating to a swing state; they were not, she contends, indications of an intent to reside permanently thereafter in Colorado.[6]  In any event, she returned to, and registered to vote in, Nevada by at least January 2008.  To the extent these actions bear on Stanton's alleged intent to remain in Colorado permanently, the court credits Stanton's testimony, and leaves for other courts the consequences of her contrary statements made under penalty of perjury.[7]

As to physical residence, one of Stanton's long-time friends testified that Stanton has been playing duplicate bridge with her in Nevada continuously since 2002, sometimes as often as three times a week.  Stanton also produced utility bills from before 2004 in her name for the Nevada

_____

[5]The court cautioned Stanton that her conduct could be construed to constitute voter fraud, and thereafter her counsel sought to interpose Stanton's rights under the Fifth Amendment with respect to her 2004 activities.

[6]*Collier* does state that domicile "is the place where one intends to return when one is absent *and where one's political rights are exercised.* " COLLIER, *supra*.  While this test might indicate that Stanton's domicile was Colorado *in 2004*, there is no dispute that she registered to vote in Nevada by 2008, and has resided here since that time.  Moreover, her testimony regarding her 2004 decision indicates that she was motivated more by a desire to prevent the election of a Republican president than an interest in local election matters.

[7]Weidman contends that Stanton is judicially estopped from asserting a Nevada domicile because she signed, under penalty of perjury, various application to induce Colorado authorities to issue her a Colorado driver's license and to allow her to vote there in 2004.  "Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing parties from abusing the judicial process by achieving success on one position and then arguing the opposite to suit an exigency of the moment."  *In re Greene*, 346 B.R. 835 (Bankr. D. Nev. 2006), *aff'd in part, rev'd in part on other grounds*, *Greene v. Savage (In re Greene)*, 583 F.3d 614 (9th Cir. 2009).  While Stanton's actions might have been sufficient to prevent her from testifying that she had the intent, *in 2004*, to claim Nevada as her domicile, they do not prevent her from testifying that from and after December 15, 2008  she intended to remain in Nevada.  Four years followed the 2004 activity, making that activity indicative rather than preclusive on the point of Stanton's intent in 2008.  As to Stanton's state of mind in 2008, the court finds her testimony at the evidentiary hearing, and her 2008 Nevada voter registration, to be more credible and more probative.

1    house, as well as various medical bills sent to the Nevada house.  Her federal tax returns all list a

2    Nevada address.  All of this evidence indicates a continuous presence in Nevada.

3              Finally, Weidman herself acknowledged that by late 2008 Stanton had relocated to Nevada.

4    In paragraph 2 of her complaint filed against Stanton in Colorado state court on October 19, 2008,

5    she stated: "Stanton is an individual who resides [in] Henderson, Nevada . . . ."

6              All this leads the court to conclude that at all times since the acquisition of her Nevada

7    house in 2002, Nevada has been Stanton's domicile.  Even if incorrect, the evidence is even

8    stronger that from at least mid-2008, if not sooner, Stanton has resided in Nevada, and that Nevada

9    has been Stanton's domicile.  Either of these findings subsume more than enough time to allow

10   Stanton to select Nevada exemptions under Section 522(b)(3).

11             B.      *Effect of Homestead Declaration Filed Post-Petition*

12             As stated by the Nevada Supreme Court:

13             Nevada has a constitutional imperative that homestead property be exempt from legal
             process and placed outside the reach of creditors.  Nevada Constitution Article 4,

14           Section 30 provides, in relevant part and with emphasis added, that "[a] homestead as
             provided by law, shall be exempt from forced sale under *any* process of law."  To

15           comply with this constitutional mandate, the Nevada Legislature enacted what is now
             NRS 21.090, which specifically exempts a homestead from execution.

16

17   *Contrevo v. Mercury Fin. Co. (In re Contrevo)*, 153 P.3d 652, 654 (Nev. 2007) (emphasis in

18   original).  The Nevada legislature has implemented the constitutional imperative by defining a

19   homestead as "[a] quantity of land, together with the dwelling house thereon and its appurtenances."

20   NEV. REV. STAT. § 115.005(2)(a).  XxxThis homestead extends to the claimant's equity in the

21   homesteaded property up to a maximum of $550,000.  *Id.* § 115.010(2).

22             To secure the benefits of Nevada's homestead protection, a debtor must record a declaration

23   of homestead.  *Id.* § 115.020.  Such a declaration is necessary to enjoy the full benefits of the

24   homestead exemption.  *I.H. Kent Company v. Busscher*, 277 F.2d 901, 905 (9th Cir. 1960) ("'To

25   secure the benefits of the constitutional and statutory provisions exempting the homestead from

26                                                    6

1  forced sale under process of law, it is necessary that a declaration of homestead be filed of

2  record . . . .'") (quoting *Lachman v. Walker*, 15 Nev. 422 (1880)); *McGill v. Lewis*, 116 P.2d 581,

3  583 (Nev. 1943).

4        Here, Weidman contends that Stanton may not claim a Nevada homestead on her Nevada

5  residence because, at the time Stanton filed her bankruptcy petition, she did not have a valid

6  declaration of homestead on file with the Clark County recorder's office.  Weidman's argument is

7  that Stanton's alleged break of residency in 2004 was effectively a renunciation of her Nevada

8  domicile, which in turn rendered Stanton's 2003 declaration of homestead ineffective for any future

9  return.  Weidman contends that, upon resumption of Nevada residency, a new declaration was

10 necessary, just as if Stanton had returned to a different dwelling when she returned to Nevada.

11       As an initial matter, given the court's finding that Stanton has resided in Nevada with the

12 intent to remain permanently since acquisition of the Nevada house in 2002, this argument has no

13 legal basis.  But even if the court had found differently, Weidman's argument still would not

14 prevail.

15       The critical fact is Stanton's March 31, 2011 filing of a new homestead declaration.  Under

16 Nevada law, a homestead declaration can be filed at any time prior to sale at execution and be

17 effective to protect the debtor's interest in the property homesteaded.  *Herndon v. Grilz*, 920 P.2d

18 998, 1001 (Nev. 1996) ("Early Nevada decisions have held that a subsequent declaration of

19 homestead will defeat a prior existing lien perfected against the property when the lien attaches at a

20 time when the property has the character of a homestead.").  Indeed, the declaration is effective

21 even if it is filed simultaneously with an attempted levy.  *Id.*  ("[W]e now recognize as a general

22 rule that when the right to claim a homestead and a judgment lien attach simultaneously to a piece

23 of property, the homestead right prevails.").

24       Given this interpretation of Nevada law, the United States Supreme Court has held that the

25 filing of a declaration of a Nevada homestead after the filing of a bankruptcy case but before sale of

7

the property is effective against the bankruptcy trustee. *Myers v. Matley*, 318 U.S. 622 (1943). In *Matley*, a separated spouse filed a declaration of homestead on property listed in her husband's bankruptcy schedules almost a month after the commencement of her husband's case. The Court affirmed the Ninth Circuit's position that the declaration was valid as against the bankruptcy trustee.

*Matley* analogized the filing of a petition in bankruptcy to a state court levy, and a trustee's sale to a state court execution sale. As the Court stated:

> Our question then is whether, under the constitution and statutes of Nevada, a declaration of homestead would be effective as against a creditor to prevent a judicial sale of the property if made and recorded after levy but before sale thereunder. If it would, it must be equally effective as against the trustee, whose rights rise no higher than those of the supposed creditor and attach at the date of the inception of bankruptcy.

*Id*. at 627. As the Court noted, Nevada state law permitted the filing of a declaration of homestead to be effective at any time after levy but before an execution sale. *Id.* The Court thus reasoned that a bankruptcy debtor could similarly file a declaration of homestead after the petition date but before the trustee actually sold the property. As it stated:

> [I]t remains true that, under the law of Nevada, the right to make and record the necessary declaration of homestead existed in the bankrupt at the date of filing the petition as it would have existed in case a levy had been made upon the property. The assertion of that right before actual sale in accordance with State law did not change the relative status of the claimant and the trustee subsequent to the filing of the petition.

*Id*. at 628. Any other result would give the bankruptcy trustee, as the representative of creditors, more power than held individually by the creditors he or she represents.

*Matley* creates a parallelism between a levy and a later sale upon execution under state law, and the filing of a petition and the later sale by a trustee under bankruptcy law. As a consequence, reasoned the Court, just as a state court judgment debtor may file a declaration of homestead after levy but before any sale, a bankruptcy debtor may file a declaration after the filing of a petition but before a trustee's sale. *Id.*

8

Case law in this district has continued to apply *Matley*, even after the enactment of the Bankruptcy Code in 1978. *See, e.g.*, *In re Sullivan*, 200 B.R. 682 (Bankr. D. Nev. 1996), *aff'd mem.*, 163 F.3d 607 (9th Cir. 1998); *In re Zohner*, 156 B.R. 288 (Bankr. D. Nev. 1993). The key case is *Zohner*.[8] There, a debtor had filed bankruptcy on March 26, 1993. She thereafter recorded a declaration of homestead on April 7. Two judgment lien creditors objected, contended that exemptions had to be determined as of filing, and that postpetition actions could not save the homestead.

Judge Jones (now Chief Judge Jones of the District of Nevada) overruled the objection. Relying on *Matley*, Judge Jones stated that "the fact that Zohner did not execute and record her homestead declaration until after she filed bankruptcy does not invalidate her exemption claim." *Id.* at 290. In this regard, he examined *Matley* and found that its reasoning was still sound and should be followed. *Id.*

Weidman, however, urges this court to disregard *Matley*, and follow what she perceives to be the holding in *In re Greene*, 346 B.R. 835 (Bankr. D. Nev. 2006), *aff'd in part, rev'd in part on other grounds*, *Greene v. Savage (In re Greene)*, 583 F.3d 614 (9th Cir. 2009). In *Greene*, Judge Zive stated"the homestead exemption must be determined as of the petition. What occurs later is not germane." *Id.* at 844. Seizing on this language, Weidman urges this court to adopt her view of *Greene*, reject *Matley*, and find that declarations of homestead filed after the petition date are a nullity. Granting that request, however, is beyond this court's power; no matter how old, Supreme Court precedent is still binding precedent, and must be followed. The rule of law and the doctrine of *stare decisis et non quieta movere* – meaning "to stand by and adhere to decisions and not disturb what is settled" – requires it. *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) (a judge "may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of

[8][Omitted]

9

1    appeals who have ruled on a controlling legal issue, or with Supreme Court Justices writing for a

2    majority of the Court. . . .   Binding authority must be followed unless and until overruled by a body

3    competent to do so.").

4        Weidman half-acknowledges this, but argues that *Matley* does not control because it was

5    decided under the 1898 Bankruptcy Act, under which exempt property never came into the estate.

6    Under the present 1978 Code, in contrast, exempt property does initially become part of the estate,

7    and then is excluded through the claim of exemption process.  *See Schwab v. Reilly*, 130 S.Ct. 2652,

8    2667-68 (2010).  It is unclear that Weidman's argument is anything more than a simple statement

9    that the federal statute construed in *Matley* is not the same statute at issue here.  Her brief does not

10   attempt to show why the difference in law dictates a difference in result.  It does not discuss the

11   analogies drawn between levy and filing the petition and the federal policy of not bestowing upon

12   the trustee powers greater or lesser than those held by judgment creditors under state law.  In short,

13   Weidman points out a distinction, but never articulates why it matters.  It is the classic "distinction

14   without a difference."  The argument is accordingly unpersuasive and rejected.

15       Moreover, Weidman misreads *Greene*.  Judge Zive's language in *Greene* is perfectly

16   consistent with this court's understanding of Nevada law.[9]  When Judge Zive stated "the homestead

17   exemption must be determined as of the petition," he was referring to the corporeal scope or extent

18   of the homestead exemption, not the separate question of whether or not all procedural steps for its

19   recognition had been taken.  Under Nevada law, the amount of land to be protected is fixed as of the

20   date of the bankruptcy petition; a debtor cannot expand his or her homestead to property acquired

21   (such as through inheritance or gift) after the petition date.  But limiting the scope or amount of

22   _____

23       [9]Judge Zive had earlier cited and discussed both *Zohner* and *Matley* with approval.  *In re
     Sullivan*, 200 B.R. 682, 686 (Bankr. D. Nev. 1996), *aff'd mem.*, 163 F.3d 607 (9th Cir. 1998).  This

24   citation gives rise to at least a presumption that if Judge Zive had meant *Greene* to reject both *Zohner*
     and *Matley*, as well as his own prior reasoning, the opinion would have been very differently

25   structured.

26                                            10

property protected is different than denying the protection entirely.  As *Matley* acknowledged,

protection in Nevada is keyed to the filing of the homestead declaration.  Until that time, the

homestead interest "is nothing but an inchoate right that springs into effectiveness only by the

application or declaration of those named and in no other manner." *I.H. Kent Co. v. Miller*, 366 P.2d

520, 521 (Nev. 1962).  Here, the filing of the petition fixed the scope and amount of the inchoate

right of homestead, in the same manner as a levy might.  It did not preclude Stanton from filing a

declaration and obtaining the benefits of the homestead shield.

    As stated above, this court cannot ignore that the state statute considered in *Matley* is

substantially the same state statute as at issue here, and that there has been no change in the federal

policies of deferring to state primacy in crafting exemptions as well as construing the trustee's

powers.  As a consequence, the court will follow *Zohner*, and hold that Stanton's March 31

declaration was sufficient to bestow upon her the full benefits of Nevada's homestead protection,

assuming that such action was required.

    C.    *Application of 11 U.S.C. § 522(o)*

    Bankruptcy courts have long tolerated exemption planning – the strategic transmutation of

nonexempt assets into exempt assets.  As stated in the legislative history to the 1978 Code: "As

under current law, the debtor will be permitted to convert non-exempt property into exempt

property before filing a bankruptcy petition.  The practice is not fraudulent as to creditors, and

permits the debtor to make full use of the exemptions to which he is entitled under the law."  H.R.

REP. NO. 595 95th Cong., 1st Sess. 361 (1977); S. REP. NO. 989, 95th Cong.2d Sess. 76; *see also*

*Gill v. Stern (In re Stern)*, 317 F.3d 1111, 1115 (9th Cir. 2003) ("'the purposeful conversion of

nonexempt assets to exempt assets on the eve of bankruptcy is not fraudulent per se.'") (quoting

*Wudrick v. Clements*, 451 F.2d 988, 989 (9th Cir. 1971)).

    There have, of course, always been limits.  These limits, however, were judicially imposed,

rather than imposed by statute.  *See* COLLIER, *supra*, at ¶ 522.08[2]-[3].  This changed in 2005 when

11

Congress added Section 522(o) to the Bankruptcy Code.  That section states:

> For purposes of subsection (b)(3)(A), and notwithstanding subsection (a), the value of an interest in— . . . .
> > (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead;
>
> shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

Weidman claims that the 2008 payoff of Stanton's deed of trust on her Nevada residence qualifies under this section.  If applicable, Stanton's value in her house would be reduced by the payoff amount – roughly $89,000 – and that amount would then be available for payment to Stanton's creditors.

       1.      The Requirements of Section 522(o)

Section 522(o) has four essential components. To prevail, a creditor or trustee must show: (a) an increase in the value of the debtor's homestead; (b) that the increase was "attributable" to the disposition of nonexempt assets; (c) that the disposition of the nonexempt assets was made with the intent to hinder, delay, or defraud a creditor; and (d) that the disposition occurred during the ten-year period ending on the date the debtor's bankruptcy petition was filed.

Two of these components are not at issue.  Stanton did increase the value of her homestead with the payoff of her deed of trust, and that payoff occurred within ten years of her filing.  This leaves two components at issue: whether the increase was attributable to the disposition of exempt assets, and whether that disposition was done with the intent to hinder, delay, or defraud a creditor.

       2.      Whether Stanton's Increase in Homestead Value Was Attributable to the Deed of Trust Payoff

Weidman introduced evidence that Stanton liquidated assets held with Sagepoint

Investments (an affiliate of AIG) and others,[10] and then gave over close to $190,000 of the sales proceeds to her son, ostensibly for debts owed.  Her son, however, used these funds to pay off the note secured by the deed of trust Stanton signed.  Stanton testified that she understood that her son would pay off the deed of trust, and that the money was transferred to him upon that implied, if not express, condition.[11]

The interposition of sham or unnecessary parties cannot obscure the source of the funds under Section 522(o).  Equitable considerations and fraudulent transfer law have often collapsed transactions when one of the purposes of the interposition of parties has been to hinder, delay, or defraud the debtor's creditors.  *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1994) ("an allegedly fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan "must be viewed as a whole with all its composite implications."'") (quoting *Pereira v. Checkmate Commc'ns Co.* (*In re Checkmate Stereo & Elec., Ltd.*), 9 B.R. 585, 612 (Bankr. E.D.N.Y. 1981) (in turn quoting *Buffum v. Peter Barceloux Co.*, 289 U.S. 227, 232 (1933)); *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 218-19 (3d Cir. 1990)

---

[10]There is no serious dispute that the funds given to her son were nonexempt in Stanton's hands.  Stanton made a half-hearted argument that the funds were proceeds of exempt wages, stemming from a decade earlier when she had worked for a bank in California.  She failed to back up this argument, however, with any evidence.  Moreover, the funds were not held in any tax-deferred manner.

[11]To be precise, Stanton received two significant checks from sales of investments in Sagepoint in late September 2008, after the evidence had closed in her sister's case but before judgment had been entered.  These were in the amounts of $31,188 and $90,732.47, respectively.  She deposited these amounts in her Wachovia money market account, withdrawing $53,000 at the same time.  In October, after her sister's judgment was entered, she closed the Wachovia account to avoid garnishment by her sister, and received over $120,000 in funds.

On November 19, 2008, Stanton wired $189,860 to her son's account at Citibank.  That amount was more than sufficient to cover the $90,000 her son had wired two days earlier to the bank holding the deed of trust on Stanton's Nevada residence.  After all was said and done, the deed of trust payoff amounted to $89,945.  After receipt of the $189,860 wire, Stanton's son then withdrew $100,000 from the account in a check upon which he was both the payee and the drawer.

1  (collapsing sham transactions intended to defraud creditors).

2       This case presents a fair case for application of that principle.  Stanton sold nonexempt

3  assets, gave them to her son (whether for a debt or as a gift is immaterial), and then expected

4  (apparently according to a mother-son agreement) that he would pay off her deed of trust debt.  That

5  he did.  These transfers were made at a time when Stanton feared imminent garnishment of any

6  intangible asset she held.  Under these circumstances, equity and this court demand that the

7  transactions be collapsed, with the effect that Stanton's deed of trust payoff can be fairly attributed

8  to the liquidation of her nonexempt Sagepoint investments.

9            3.       Whether Stanton Had the Intent to Hinder, Delay, or Defraud

10      Section 522(o) uses the historic language of fraudulent conveyances – first drafted over 400

11  years ago in the Statute of 13 Elizabeth.  *See* 13 Eliz., ch. 5 (1571), *repealed by* The Law of

12  Property Act, 15 Geo. 5, ch. 20, § 172 (1925).  This language condemns transfers made with "the

13  intent to hinder, delay, or defraud."  *Id.*  In interpreting the use of this venerable language in Section

14  522(o), most courts have looked to cases interpreting statutes incorporating this same language for

15  guidance.  *See Addison v. Seaver (In re Addison)*, 540 F.3d 805 (8th Cir. 2008); *In re Maronde*, 332

16  B.R. 593, 599 (Bankr. D. Minn. 2005) ("It is only logical to assume that Congress intended that by

17  using essentially the same phrase in § 522(o), cases construing the fraudulent conveyance and

18  discharge provisions also would apply to add body to the bare words of this new Congressional

19  language"); *In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006) (construing the meaning of

20  "intent to hinder, delay, or defraud a creditor" in § 522(o) from cases construing the meaning of

21  intent to hinder, delay, or defraud in §§ 722(a)(2) and 548(a)(1)); *In re Lacounte*, 342 B.R. 809, 814

22  (Bankr. D. Mont. 2005) (same); *In re Sissom*, 366 B.R. 677, 691-92 (Bankr. S.D. Tex. 2007)

23  (same); *see* COLLIER, *supra*, ¶ 522.08[5][a] ("In light of Congress' adoption in section 522(o) of the

24  identical "intent to hinder, delay or defraud" language found in section 548(a)(1)(A) and section

25  727(a)(2), courts may look to case law under these sections for guidance in construing the requisite

26                                         14

intent under section 522(o).").

This interpretive incorporation gives courts over 400 years of judicial decisions to work with.  During this time, however, debtors have rarely admitted under oath that they possessed the requisite malign intent.  As a result, courts have relied on circumstantial evidence of intent, and have created interpretive methods to divine the existence of such intent.  As stated by *Collier*:

> [C]ourts built bridges from questionable acts commonly associated with fraud to findings of actual fraudulent intent.  Called "badges of fraud," these indicia of transactions imbued with fraud developed into a sort of common law shopping list for those seeking to levy on property thought to be properly part of a debtor's estate.  Courts define "badges of fraud" differently, but with the same sense:  A "badge of fraud" is a fact which makes a transaction suspicious, thus calling for an explanation.

5 COLLIER, *supra*, ¶ 548.01[b][1]; *see also id.* at ¶ 549.04[1][b][i]; *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) (describing badges of fraud as "a set of objective criteria … use[d] as a basis for inferring fraudulent intent.").

Section 4(a) of the Uniform Fraudulent Transfer Act contains a nonexclusive listing of the traditional badges of fraud.  Section 4(b) of that act states:

In determining actual intent . . ., consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

15

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

UNIF. FRAUDULENT TRANSFER ACT § 4(b) (1984), *reprinted in* 7A (pt. II), UNIF. LAWS ANN. 2 (2006) (codified in Nevada at NEV. REV. STAT. § 112.180(2)(a)-(k)).  Comment 5 to that section explains this list:

> Subsection (b) is a nonexclusive catalogue of factors appropriate for consideration by the court in determining whether the debtor had an actual intent to hinder, delay, or defraud one or more creditors. Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation. The list of factors includes most of the badges of fraud that have been recognized by the courts in construing and applying the Statute of 13 Elizabeth and § 7 of the Uniform Fraudulent Conveyance Act.

UNIF. FRAUDULENT TRANSFER ACT § 4, cmt. 5, *reprinted at* 7A (pt.II) UNIF. LAW ANN., *supra*, at 59-60.

Courts may use badges of fraud not only to show the intent to defraud, but also to show the intent to hinder or the intent to delay.  As the statute's phrasing is in the alternative, a showing of any one of the three requisite states of mind – the intent to hinder, the intent to delay, *or* the intent to defraud – is sufficient to establish the intent element.  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) ("As the use of the disjunctive "or" makes clear, '[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud.'") (quoting United States v. Carlin, 948 F. Supp. 271, 277 (S.D.N.Y. 1996)); *Bayou Accredited Fund, LLC v. Redwood Growth*

16

*Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008) ("The malicious intent sufficient to support a cause of action is set forth in the disjunctive-a plaintiff may avoid the transfer where it was made with intent "to hinder, delay, *or* defraud.") (emphasis in original). *Cf.* 11 U.S.C. § 362(d)(4) (phrasing the intent required for *in rem* relief from the automatic stay to be the intent "to delay, hinder, *and* defraud creditors") (emphasis added).

Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all. As *Collier* states: "Whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient." 5 COLLIER, *supra*, at ¶ 548.04[1][b][ii]. As stated by the First Circuit, "[t]he presence of a single badge of fraud may spur mere suspicion … ; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991).

Weidman attempted to prove Stanton possessed the intent to hinder, delay or defraud by adducing a wide array of evidence that, soon after the judgment was entered, Stanton began cashing out her real estate and other investments and using the proceeds to pay debts (primarily to lawyers) and to make gifts to her immediate family. In this regard, this evidence is evidence of unusual transactions near the time litigation is instituted or concluded. *See* UNIF. FRAUDULENT TRANSFER ACT § 4(b)(4), (9). She also granted liens to her children on her previously unencumbered nonexempt rental property in Colorado, to secure debts allegedly owed them, soon after she knew that her sister was attempting to levy upon the property.[12] *See* UNIF. FRAUDULENT TRANSFER ACT § 4(b)(1).

---

[12]The rental property was titled in a trust of which Stanton was apparently the settlor and, during her lifetime, is the primary beneficiary. Weidman's lawsuit sought a declaration that the property was, in equity, Stanton's and not the trust's, so that Weidman could levy on the property and sell it.

The combination of badges of fraud is part of a pattern that is both lamentable and common: the hurried transfer of assets by a debtor to friends and confederates so that they are beyond the reach of creditors.  Here, the evidence shows that Stanton liquidated over $400,000 in real estate and other investments within months of the entry of Weidman's judgment, and then distributed the proceeds to friendly creditors (other than Weidman) and immediate family.  And the evidence also shows she did this with the knowledge that Weidman, by then an aggressive judgment creditor, was garnishing or levying upon anything that her sister had (at least to the extent that Weidman knew about it).  These actions are hoary badges of fraud, engaged in by debtors from time immemorial.  *See, e.g.*, FREDERICK S. WAIT, FRAUDULENT CONVEYANCES AND CREDITORS' BILLS § 233, at 321-22 (1884);  *Twyne's Case*, 3 Co. Rep. 80b, 76 Eng. Rep. 809 (Star Ch. 1601) (indicia of fraud included the fact that the conveyance at issue "was made pending the writ").

Stanton countered that she simply was doing what any prudent investor would have done given the economic climate of late 2008: liquidating assets into cash, and reducing debt.  She invoked a ukase of her late father: pay off real estate debt as soon as possible.  That she followed this edict before the entry of her sister's judgment is supported by Stanton's activities after she initially acquired the Nevada real estate; she paid more than half of the principal balance during the six years preceding the entry of her sister's judgment.  She also contends that she was still solvent, and entitled to dispose of her assets as she saw fit.  Finally, she offers up a version of "the devil made me do it" defense; she contends that she was merely following the advice of lawyers and other professionals.

But these justifications have an eely ad hoc feel to them.  Stanton's demeanor on the witness stand did not convey the impression that the transactions in late 2008 were anything but the moves of a debtor desperate to keep control of her assets for her immediate family and selected creditors.  The timing is a fact that cannot be overcome.  Within months of the entry of Weidman's judgment, Stanton liquidated hundreds of thousands of dollars in assets, and made payments to creditors and

18

1  gifts to others with the proceeds.  There was no evidence that she reinvested any of the money, even
2  in a certificate of deposit or a money market account.

3      Stanton's response is that most of the asset sales occurred after she knew about her sister's
4  judgment, but before she knew its amount.  This is another distinction without a difference, and it is
5  not credible.  Rather than credit Stanton's twist on the facts, the court finds that the timing of the
6  sales is strong and clear evidence of the requisite malign intent, rather than evidence it was not
7  present.  It is not seriously doubted, for example, that the majority of her transactions occurred after
8  she obtained knowledge of the judgment, which is sufficient regardless of her state of mind as to the
9  amount of that judgment.  She sat through the Colorado trial, and knew the magnitude of the
10 possible liability long before she admitted to knowing of the precise amount of her sister's
11 judgment.

12     The solvency argument is also unavailing.  Section 522(o) focuses exclusively on intent, in
13 the same way and with the same words as the Statute of 13 Elizabeth; the transferor's solvency is
14 not a defense.[13]  *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639–40 (2d Cir. 1995) (payment of
15 fees depleted assets available to future creditors); *Atlanta Shipping Corp. v. Chem. Bank*, 631 F.
16 Supp. 335, 339 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987) (payment of loans depleted
17 assets available to creditors); *Merrill v. Abbott* (*In re Independent Clearing House Co.*), 77 B.R.
18 843, 856 (D. Utah 1987); *In re Vaniman Int'l, Inc.*, 22 B.R. 166 (Bankr. E.D.N.Y. 1982).

19     Moreover, were solvency an issue, Stanton failed to introduce any comprehensive evidence
20 of the fact.  She relies on the fact that she believed her Colorado rental was unencumbered and

21

---

22     [13]Insolvency is a traditional badge of fraud, but solvency is but a weak indicator of the absence
of the required intent. When present, solvency tends to negate the inference that a debtor would try to
23 hinder, delay, or defraud creditors, because, by hypothesis, the debtor has enough assets to pay all
creditors in full.  *See* 5 COLLIER, *supra*, at ¶ 548.04[1][b][iii].  Here, however, stronger reasons exist
24 to believe that Stanton intended to hinder, delay, of defraud her sister; Stanton did not pay the
judgment, despite receiving the liquidation proceeds from her assets, and obviously was liquidating
25 assets to keep them away from a legitimate creditor – her sister.

26

worth more than $450,000.  But no direct evidence of other debts was introduced, except by

indirection.  For these, Stanton claimed to pay (presumably because she owed) her attorneys over

$400,000.  She also does not count her sister's judgment. With such selective presentation of

Stanton's financial profile, any claims of solvency cannot be seriously or rigorously assessed.

Finally, Stanton's defense of reliance on the advice of professionals also fails.  Initially,

reliance on the advice of others is not an affirmative defense; it is simply evidence that the debtor

did not possess the intent required by Section 522(o).  *See, e.g., First Beverly Bank v. Adeeb (In re*

*Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986) (finding that a debtor's reasonable reliance on the

advice of counsel was evidence of lack of "fraudulent intent" for purposes of Section 727

(a)(2)(A)); *Buckeye Retirement Co., LLC v. Swegan (In re Swegan)*, 383 B.R. 646, 656 (B.A.P. 6th

Cir. 2008) (same) (citing *In re Adeeb*, 787 F.2d at 1343).  Further, any reliance must also have been

in good faith.  *In re Adeeb*, 787 F.2d at 1343.

If a professional counsels a client to make a transaction that the professional knows will

hinder or delay creditors, and which the client knows or should know would have the same effect,

the transaction is made with the requisite intent regardless of the intercession of the professional.

Put another way, a debtor cannot blindly rely on advice of others as a shield; good faith requires any

reliance to be reasonable.  Regardless of the advice actually given (and Stanton never testified as to

any specific advice, just what was told to her generally), Stanton knew the purpose of the

transactions was to keep assets away from a legitimate creditor – her sister.  She testified that she

stopped maintaining checking or money market accounts because her sister would discover and

garnish them.

Stanton's uncorroborated testimony that she relied on others is insufficient to show that she

did not act with an intent to hinder or delay.  The evidence demonstrated that Stanton's

systematically and intentionally liquidated her assets in a manner designed to avoid paying her

sister's judgment.  After considering all the evidence, Stanton's reliance, if any, on the advice of

20

counsel or other professionals is insufficient to outweigh the natural conclusion that she actually possessed the required malign intent for purposes of Section 522(o).

As a result, this court finds that Stanton's transactions at the end of 2008 hindered and delayed her sister, with the intended consequence of running up her sister's collection costs and delaying the inevitable payment of her sister's judgment. The timing and amount of the transactions – all corresponding to classic badges of fraud – provide a basis to find, and the court does find, that Stanton knew what she was doing, knew the effect it would have on her sister, and intended those consequences. The transactions leading to the payoff of Stanton's deed of trust were part of these general transactions, and were imbued with the same malign intent as all of the other transactions. In short, Stanton caused the funds transferred from her nonexempt Sagepoint account to be used to pay the note secured by a deed of trust on her residence, and thus increase her equity in that property, all the time possessing the intent specified in Section 522(o). As such, Section 522(o) applies, and the value of Stanton's interest in her Nevada residence will be reduced by the amount of the pay off.

### III. Conclusion

Stanton is entitled to claim a Nevada homestead exemption in her Nevada residence. In accordance with Section 522(o), however, the value of Stanton's interest in her homestead will be reduced by $89,945, the amount of the loan payoff made in 2008.[14]

Copies sent to:

CM/ECF ELECTRONIC NOTICING

BNC MAILING MATRIX

# # #

---

[14]This opinion shall constitute the court's findings of fact and conclusions of law in accordance with FED. R. BANKR. P. 7052, made applicable to this contested matter by FED. R. BANKR. P. 9014(c).